Elija KARRIEM, Minister, Appellant

v.

Marion S. BARRY, Mayor, et al.

No. 83–1184.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1984.
Decided Sept. 11, 1984.

Judith Barry Wish, Washington, D.C. (appointed by this Court), with whom M. Carolyn Cox, Washington, D.C., was on the brief, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before WALD and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Appellant challenges the District of Columbia's requirement that ministers seeking regular entrance to the correctional facilities negotiate a standard Volunteer Services Agreement. The district court on cross-motions for summary judgment upheld the Department of Correction's mandate as reasonably related to correctional needs for order and security. Because important factual questions that may affect our interpretation of the relevant District of Columbia statute remain unresolved, we remand for further findings by the district court.

## I. STATUTORY AND REGULATORY BACKGROUND

The Volunteer Services Act of 1977 [1] (the Act) was adopted in order to reverse a longstanding rule against the use of volunteers in most District of Columbia programs and agencies.[2] The Act established the broad policy under which the District would "utilize volunteer citizens in as many governmental programs as is practicable to serve the interests of the community." [3] The Act provided that volunteers may not, however, "be used to fill any position or perform any service which is currently being performed by an employee of the District of Columbia Government." [4] "Volunteer" is defined as "a person who donates his or her services to a specific program or department of the District of Columbia government by his or her free choice and without payment for the services ren-

---

1. D.C.L. No. 2–12, 23 D.C.Reg. 8985, 24 D.C.Reg. 1442 (codified at D.C.CODE ANN. §§ 1–304 to –308 (1981)).

2. Act of July 7, 1898, ch. 571, 30 Stat. 652, 666, *repealed by* Volunteer Services Act of 1977, D.C.L. No. 2–12, § 6(a), 23 D.C.Reg. 8985, 8987, 24 D.C.Reg. 1442. Prior to the enactment of the Volunteer Services Act, volunteers could be used by the District only in limited situations for which exceptions to the general prohibition had been provided by statute. Ministers or religious leaders were not included in these statutory exceptions, which were repealed when the Volunteer Services Act was adopted.

3. D.C.CODE ANN. § 1–304 (1981).

4. *Id.* Obviously, a literal construction of this provision would bar the use of most volunteers. Consequently, under regulations promulgated by the Office of Personnel, volunteers are permitted to augment or supplement the provision of services normally staffed by employees and to provide services that would not be available under existing programs and resource levels. D.C.Personnel Regs. §§ 4004.4 to .5, 29 D.C.Reg. 5405, 5406 (1982).

dered"; [5] in contrast, an "employee" is defined as "a person who is paid by the District of Columbia government . . . for his or her services." [6] Under the Act, volunteers are "considered employees of the District of Columbia government" for purposes of insulation from liability for certain torts committed within the scope of their service; [7] the District assumes liability to third parties "for tortious injury caused by volunteers under its supervision and control." [8] Like employees, individuals injured while performing volunteer service are eligible for disability compensation benefits, [9] and volunteers are subject to policies against conflicts of interest, including restrictions on political activity. [10] In other respects, however, volunteers are treated differently from employees under the Act. Although certain expenses may be reimbursed, [11] volunteers are not, of course, entitled to compensation. Nor are they enti-

tled to retirement or unemployment benefits, or to life or health insurance based on their volunteer service. [12]

The Volunteer Services Act was not self-executing; instead, the Act became effective upon the promulgation of implementing regulations by the Director of Personnel, acting under the delegated authority of the Mayor. [13] Under these regulations, the decision whether to use the services of a particular volunteer is left to the discretion of each District agency. [14] Agencies may supplement the personnel regulations "when appropriate," [15] but may not "limit, waive, amend, or otherwise modify the restrictions and requirements on the use of voluntary services set forth in [the personnel regulations] without the approval of the Director of Personnel." [16] The supplemental Corrections Department regulations are not in dispute in this case. [17]

5.  D.C. CODE ANN. § 1–308(2) (1981).

6.  *Id.* § 1–308(1).

7.  *Id.* § 1–306(c) (citing D.C. CODE ANN. §§ 1–1211 to 1–1216 (1981)); *see also* D.C.Personnel Regs. § 4000.10, 29 D.C.Reg. 5405, 5407 (1982).

8.  D.C. CODE ANN. § 1–306(d).

9.  This benefit was not included in the original enactment. *Id.* § 1–306(b) (1981). However, the Merit Personnel Act extended disability benefits to volunteers effective May 2, 1979. *Id.* §§ 1–624.1(1)(B), 1–637.1(h) (1981); *see* D.C. Personnel Regs. § 4000.9, 29 D.C.Reg. 5405, 5406 (1982).

10.  *Id.* § 1–306(a). In the case of volunteers, political involvement is banned only "during the time voluntary services are being performed." D.C.Personnel Regs. § 4000.15, 29 D.C.Reg. 5405, 5407 (1982).

11.  D.C. CODE ANN. § 1–308(2) (1981).

12.  *Id.* § 1–306(b).

13.  *See id.* §§ 1–305, 1–306(a). Regulations were first published on February 6, 1979 as Chapter 8E of the District Personnel Manual. Appellant's Statutory Appendix 15–23. On December 10, 1982, the Director of Personnel promulgated new regulations that restate, without substantive change, the regulations originally contained in the Personnel Manual. D.C.Personnel Regs. § 4000, 29 D.C.Reg. 5405 (1982).

14.  D.C.Personnel Regs. §§ 4000.12, 4000.13, 29 D.C.Reg. 5407. No right of appeal is accorded an individual whose voluntary service is rejected or terminated by an agency. *Id.* Agency discretion is limited, however, by a provision prohibiting discrimination on the basis of "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, place of residence or business, or any other basis of unlawful discrimination under the laws of the District of Columbia." *Id.* § 4000.20, 29 D.C.Reg. 5408.

15.  *Id.* § 4000.21, 29 D.C.Reg. 5408.

16.  *Id.* § 4000.23, 29 D.C.Reg. 5408.

17.  The Department of Corrections has supplemented the personnel regulations by requiring every volunteer to carry a photo identification card while on institutional grounds, to sign an entry log sheet separate from that ordinarily used by prison visitors, to be given a copy of the American Correctional Association's Code of Ethics as a guide to conduct, and to agree in writing to be bound by all institutional rules and regulations. *See* Corrections Dept. Order No. D.O. 1310.3A, § 6(c)–(e), (g)–(h) (Feb. 6, 1979) (reproduced in Appellant's Statutory Appendix at 12).

The Corrections Department maintains that these additional requirements are necessary to conform to the standards established by the American Correctional Association for use of citizens and volunteers in adult correctional in-

The present controversy centers principally[18] on the requirement that volunteers execute a "Volunteer Services Agreement" (Agreement), a standard form published by the Office of Personnel. It is unclear whether the Office of Personnel regulations make the use of this particular form mandatory.[19] The Agreement sets out the names of the volunteer and of the volunteer's supervisor, the duties to be performed by the volunteer, and the volunteer's duty location and schedule. The Agreement concludes with the following statement:

### Declaration of Volunteer

I hereby agree to donate my service to the D.C. Government in performing the duties described above. I understand that I will not be compensated for my services and that I am not entitled to other monetary benefits in connection with my volunteer work.

I will accept my instructions from the supervisor named above. I understand that my work assignment is limited to the duties described in this agreement unless otherwise authorized by my supervisor. I will keep my supervisor informed of my progress and will notify him/her if I am unable to report as scheduled or if I decide to terminate this agreement.

As a volunteer member of the D.C. Government workforce, I will not engage in any form of political activity during the hours I render service for the D.C. Government.

I understand that this agreement may be terminated at any time by the D.C. Government.[20]

At the heart of this dispute is whether a minister, who for sincere religious reasons is unable to endorse these statements, must nevertheless execute this Agreement as a prerequisite to gaining access to the District's prisons to perform religious services for inmates requesting his ministry.

## II. BACKGROUND

Appellant Elijah Karriem is a minister of the Nation of Islam, also known as the Black Muslims, a Black nationalist sect

---

stitutions. *See* Appellees' Brief at 9 n. 17 (citing American Correctional Ass'n, Comm'n on Accreditation for Corrections, *Manual of Standards for Adult Correctional Institutions* §§ 4456–4465 (1977)).

**18.** A threshold question exists as to whether the Volunteer Services Act and regulations are applicable to the facts of this case. *See infra* pp. 39–40.

**19.** The form was originally published as an exhibit to the regulations promulgated by the Office of Personnel. The form states, "This agreement must be completed and approved before accepting the services of a volunteer." The language of the regulation itself, however, indicates that the agencies may have some flexibility in drafting the form they will use: "Unless the department or agency chooses to establish additional requirements, the approved agreement (see Exhibit 1 to this Section) will meet the authorization requirements of these regulations in accepting volunteer services." D.C.Personnel Dep't Order No. D.O. 1310.3A, *District Personnel Manual* ch. 8E, § 5(f)(1) (Feb. 6, 1979) (reproduced in Appellant's Statutory Appendix at 21).

When the personnel regulations were republished in 1982, the exhibit setting out the standard Agreement was omitted, and no reference was made in the text of the regulations to the execution of a standard form. *See* D.C.Personnel Regs. § 4000, 29 D.C.Reg. 5405 (1982). Instead, the regulations specified that

[p]rior to engaging in the performance of voluntary services for the District of Columbia, each volunteer shall be required to sign a statement which acknowledges the following:

(a) That the volunteer has been informed of the nature and scope of the voluntary services to be performed;

(b) That the volunteer has been informed of and understands all of the provisions of this section, of D.C.Law 2–12, and of the applicable agency guidelines for the use of volunteers; and

(c) That the volunteer agrees to perform voluntary services under the terms and conditions set forth in this section, in D.C.Law 2–12, and in the applicable agency guidelines for the use of volunteers.

*Id.* § 4000.25, 29 D.C.Reg. 5408.

**20.** D.C. Personnel Dep't Order No. D.O. 1310.3A, Exhibit 1, *District Personnel Manual* ch. 8E, Exhibit 1 (Feb. 6, 1979) (reproduced in Appellant's Statutory Appendix at 23).

popularized by Elijah Muhammad.[21] In November 1981 Minister Karriem was asked by Elroy Lewis, then an inmate at the District of Columbia's Minimum Security Facility at Lorton, Virginia (Lorton), to conduct religious services for inmate members of the Nation of Islam. In accordance with Corrections Department procedures,[22] Lewis wrote to Lorton administrators asking that Minister Karriem be permitted to hold services on a regular basis within the facility.[23] Delbert Jackson, at that time the Director of the Department of Corrections, approved Lewis' request, and Minister Karriem was authorized to enter the facility to conduct religious services and classes on a biweekly basis.[24] Although the Volunteer Services Act and regulations promulgated thereunder were then in ef-

fect, Minister Karriem was not asked to subscribe a Volunteer Services Agreement when permission was initially granted for him to enter the prison regularly in a pastoral capacity.

Between December 1981 and April 1, 1982, Minister Karriem made approximately twenty visits to Lorton for the purpose of conducting religious services and classes.[25] Throughout this period, he followed the normal sign-in, identification, and inspection procedures required of all visitors to Lorton. On each occasion he indicated the purpose of his visit as "religious." In addition, both inmates and outside visitors attending the Nation of Islam services within Lorton were required to sign a second log sheet identifying them-

---

**21.** *See generally* E.U. Essien-Udom, Black Nationalism: A Search for an Identity in America (1962); C. Lincoln, The Black Muslims in America (1966); Essien-Udom, *Black Muslims,* in 2 Encyclopaedia Britannica, Macropaedia 1093 (15th ed. 1974); N.Y. Times, April 17, 1984, § A, at 16, col. 1; Newsweek, June 30, 1975, at 71. Perhaps because the appellees have not challenged the religious character or the sincerity of Minister Karriem's beliefs, the parties have supplied this court with very little information regarding the doctrine of the Nation of Islam. Where necessary for purposes of clarity, the court has taken judicial notice of accredited and widely circulated works reflecting common knowledge concerning this organization. *See Barnett v. Rodgers,* 410 F.2d 995, 1001 n. 24 (D.C.Cir.1969).

**22.** Corrections Department Order No. D.O. 4410.1, issued August 10, 1979, provides in relevant part:

3. *Policy.* It is the policy of the Department of Corrections to provide residents with the opportunity to enjoy the most extensive exercises of their right to freedom of religion so long as it does not impair security and the orderly operations of the institution. It must be recognized however, that where religious practices conflict with the requirements of the law, the law must prevail.

. . . .

5d. *Access to Ministers, Spiritual Advisors and Guest Speakers.*

(1) Residents may have access to a spiritual advisor through mail and visits, in conformity with normal regulations, including usual and generally applicable inspection.

(2) Residents may request thru [sic] chaplains, to invite guest ministers and other religious speakers to provide religious worship services in compliance with D.O. 4080.2 and

with the approval of the Assistant Director for Community and Women's Programs, and Superintendent's [sic] of Correctional and Detention Services.

**23.** Appellant's Appendix at 66 [hereinafter cited as Appendix]. The memorandum, addressed to Samuel E. Rosser, Administrator, Frank H. Phillips, Assistant Administrator of the Minimum Security Facility at Lorton, and Imam Ba'th, Islamic Chaplain at Lorton, stated:

I am respectfully writing to you this memorandum concerning the Minister [sic] the Nation of Islam in the minimum security facility. The Minister is Elijah Karriem.

It is requested that Minister Karriem be permitted to hold religious services for the Nation of Islam. Minister Karriem has told this writer over the telephone, that he would be very happy to hold religious services for the Nation of Islam.

Minister will be coming on the days that have [been] requested in my memorandum concerning "time and place to hold Islamic service."

*Id.* The "time and place" memorandum requested that Islamic religious services be held for Nation of Islam inmates in the Islamic dining room at Lorton on Sundays from 1:30 p.m. to 3:00 p.m.; that classes be conducted on Wednesdays from 6 p.m. to 10 p.m.; and that family day services be observed on the fourth Wednesday of every month. *Id.* at 67.

**24.** Appendix at 15, 40, 96; *see id.* at 4, 97–112; *see also* Appellees' Brief at 9 (indicating approval came through the Islamic Chaplain, Imam Ba'th).

**25.** *See* Appendix at 4, 97–112; Appellees' Brief at 9.

selves. Minister Karriem's entries on the second log sheet consistently noted his status as "Minister" or "Guest Minister." [26]

On April 1, 1982, for reasons that are not sufficiently clear from the record, Minister Karriem's visits to the facility to conduct religious services were abruptly halted. It is undisputed that at no time during the period in which he had been coming to Lorton did Minister Karriem violate any prison regulations or otherwise pose a threat to prison order and security, and that neither the character of the Minister's activities within the prison nor the Correction Department's regulations regarding the entry of ministers had changed. It appears, rather, that the Department of Corrections had inadvertently construed a March 23, 1982 letter from Minister Karriem as being a formal request for volunteer status.[27] For that reason—and, according to the Department of Corrections, *solely* for that reason—Lorton officials de-

cided that in order to continue his visits, Minister Karriem would be required to sign a Volunteer Services Agreement. But as Minister Karriem points out and as the record plainly shows, Minister Karriem did *not* request volunteer status in the letter upon which the Department evidently and mistakenly relied.

Minister Karriem was unable for religious reasons [28] to comply with this demand. Four features of the Volunteer Services Agreement were problematic from the standpoint of Minister Karriem's religious views. First and most important, the Agreement required the signator to stipulate that he was donating his time and services to the District of Columbia government, thus identifying the volunteer with the prison administration. Minister Karriem insists that he is *not* volunteering his efforts to the District government but rather to the inmates of Lorton as individuals.

---

26. *See* Appendix at 97–112.

27. *Appellees in their brief suggest that the reason for their change of heart was a letter to the Department of Corrections, dated March 23, 1982, in which Minister Karriem asked to be considered "as a volunteer." Appellees' Brief at 10. According to appellees, Minister Karriem first identified himself as a minister of the Nation of Islam and then stated:*

> I would like very much to respond to the men confined in the correctional facilities that are, and have been, requesting the Teachings of The Honorable Elijah Muhammad. *I am seeking the entrance into the facilities as a volunteer for the Department of Corrections.* I wish to enter the facilities on the request that the inmates acknowledge and recognize me as The Minister who will be bringing them the spiritual teachings of the Honorable Elijah Muhammad, which is a right upheld by the Constitution of the United States (First Amendment). I respectfully hope that these inmates will be granted the religious freedom and rights as the inmates are of other religious persuasions.

*Id.* (citing Appendix at 53) (emphasis in original). Appellees contend that in response to this letter, corrections officials told Minister Karriem that his request would be granted if he complied with the requirements of the Volunteer Services Act. "Minister Karriem refused to comply, and for that reason alone his request to conduct a ministry at Minimum was denied." *Id.* at 10–11.

However, Minister Karriem did *not* request volunteer status in his letter of March 23, 1982. To the contrary, the emphasized portion of the letter in fact reads: *"I am not seeking entrance into the facilities as a volunteer for the Department of Corrections."* Appendix at 53 (emphasis in original).

28. Neither the religious character nor the sincerity of Minister Karriem's beliefs has been contested by appellees. *See supra* note 21. Appellees do note that two other ministers from the Nation of Islam have volunteered their services in District correctional facilities and have complied with the requirements of the Volunteer Services Act. Appellees' Brief at 11; Appendix at 115–18. That other members of his faith were apparently untroubled by the requirements of the Act does not, however, implicate the sincerity of Minister Karriem's beliefs. As the Supreme Court recently had occasion to note:

> Intrafaith differences … are not uncommon among followers of a particular creed … and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow [church members] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 716–17, 101 S.Ct. 1425, 1431–1432, 67 L.Ed.2d 624 (1981).

This distinction is important to Minister Karriem because Black Muslims believe that the government is an unholy instrument of the White establishment in the oppression of Black people; "[a]ccording to [Elijah] Muhammad, the American government is unjust and corrupt in the eyes of Allah, and therefore it is sinful for righteous Muslims to participate in its affairs." [29]

The Agreement also requires the volunteer to submit to the supervision of and to accept instruction from a specified official. This requirement presents two difficulties. First, at the time Minister Karriem was asked to sign the form, the name of the supervising official was left blank, but all concerned understood that the supervisor would be Imam Ba'th, the prison's Islamic chaplain. Chaplain Ba'th is a former member of the Nation of Islam who "left the fold"; Minister Karriem believes that he is not permitted to associate with an "apostate" such as Imam Ba'th.[30] After Minister Karriem filed suit, corrections authorities agreed to substitute the prison administrator for Chaplain Ba'th as supervising official.[31] This accommodation, however, does not respond to Minister Karriem's second concern—the scope of supervision. The term "supervision" is not defined in the Agreement. The personnel regulations indicate that, in most contexts, supervision would include assignment of the work to be performed and instructions as to the manner in which the assigned work is to be accomplished.[32] Although Minister Karriem is willing to agree in writing to abide by prison rules and regulations, he cannot, consistent with his religious beliefs, accept instruction from any representative of the District of Columbia government as to the manner in which his ministry is to be conducted.[33] Prison officials have stated, again after suit was filed, that they intend supervision to extend only to the scheduling of visits and services and the enforcement of prison rules and regulations.[34] Yet, nowhere has this construction of the Agreement been reduced to writing.

Moreover, the Agreement prohibits volunteers from "engag[ing] in any form of political activity" during their hours of service. Again, the term "political activity" is undefined in the Agreement. Minister Karriem's religion is inextricably intertwined with sociological, economic, and political beliefs.[35] Consequently, he refuses to sign an Agreement that might prevent him from preaching his religio-political views. The Corrections Department, on the other hand, represented at oral argument that the prohibition extends only to partisan electioneering, an activity in which Minister Karriem has expressed no interest. The Department's understanding of the prohibition has not been made explicit in writing, however.

Finally the Agreement purports to be terminable at will by the Department. Obviously, the Department could not terminate Minister Karriem's visits for a constitutionally impermissible reason. Yet, Minister Karriem fears that the Department might attempt to terminate his visits because of the content of his teaching and, therefore, declines to place his "whole ministry . . . under the direct power of Government,"[36] rather than his God, Allah, by executing what might in the future be construed as a waiver.

As a result of his refusal to execute the Agreement, Minister Karriem was prohibited from further entering Lorton to conduct

---

29. Essien-Udom, *supra* note 21, at 1094.

30. Appellant's Brief at 28 n. 27.

31. *See* Appendix at 212; Appellees' Brief at 12 n. 21.

32. *See* D.C.Personnel Regs. §§ 4000.14, 4000.21, 29 D.C.Reg. 5405, 5407, 5408 (1982).

33. *See* Appellant's Brief at 28.

34. *See* Appellees' Brief at 24–25.

35. *See* Appendix at 174; Appellant's Brief at 28 n. 27; *see generally* Essien-Udom, *supra* note 21, at 250–59 *passim;* C. Lincoln, *supra* note 21; Shack, *Black Muslims: A Nativistic Religious Movement Among Negro Americans,* 3 Race 54 (1961).

36. *See* Appendix at 174.

religious services for members of his faith.[37] Minister Karriem first attempted to resolve his difficulties concerning the Agreement through the administrative processes of the Department of Corrections.[38] When these efforts proved fruitless, Minister Karriem, proceeding *pro se*, filed suit in the United States District Court for the District of Columbia seeking damages and injunctive relief. His complaint alleged that he was not a volunteer within the meaning of the Volunteer Services Act and the regulations promulgated thereunder. The complaint further asserted that application of the Act and regulations to him—effectively requiring him to become a non-paid employee of the District of Columbia government in order to continue his religious ministry in the District's prisons—violated the establishment and free exercise clauses of the first amendment as well as his fifth amendment right to equal protection of the laws.

On October 18, 1982, the district court conducted an evidentiary hearing confined to the single issue of whether Minister Karriem had been treated differently from other ministers with respect to the requirement of compliance with the Volunteer Services Act and regulations.[39] Following the hearing, the district court rendered judgment in favor of defendants on the equal protection question.[40] The court found that all ministers had been required to sign Volunteer Services Agreements in order to enter Lorton on a regular basis and that, therefore, Minister Karriem had not received discriminatory treatment.[41] The court also suggested several reasons—probable frequency of entrance, relationship with inmates, extent of access within the facility—justifying the difference in treatment between ministers and other individuals and groups, such as fashion models and musical ensembles, who enter as "guest lecturers" and who do not have to comply with the Volunteer Services Act.[42]

The district court also granted summary judgment in favor of defendants on the remaining issues raised by the complaint. The court held first that Minister Karriem was a volunteer within the meaning of the Volunteer Services Act and regulations and was, therefore, required to sign an Agreement before entering Lorton to conduct services on a regular basis.[43] The court also rejected appellant's establishment clause claim, holding that the Agreement has neither "the purpose [nor] the primary effect of advancing or inhibiting reli-

---

**37.** In response to a request from the district court, the Department agreed on September 10, 1982, to permit Minister Karriem to enter the prison once a month as a "guest lecturer." *Id.* at 212.

**38.** *See id.* at 40–43.

**39.** At the hearing three witnesses testified for Minister Karriem that they had visited and continued to visit Lorton to attend and frequently to conduct religious services for inmate members of the Nation of Islam on a periodic basis under conditions similar to those under which Minister Karriem had initially been permitted to operate. All three testified that they had never been asked to sign an Agreement and had never been prohibited from entering the facility, but had instead been required merely to follow the normal procedure for entering Lorton by signing the entry log at the gate and the Nation of Islam attendance sheet. *Id.* at 225–68.

The district court's opinion stressed the point that none of these three witnesses was a minister seeking entry in a pastoral capacity. The District of Columbia, however, has suggested to this court that an Agreement is not necessary for ministers in all instances. Furthermore, the imposition upon Minister Karriem of the requirements for "volunteering" appears to have been the result of a misreading by the District of Columbia of a letter from Minister Karriem. *See infra* p. 40. Moreover, the Department of Corrections did not produce Agreements on file that could show whether all ministers are required to be volunteers, despite a request for this production by Minister Karriem. *See* Appellant's Reply Brief at 12 n. 11. The record does not indicate the reasons that prompted the Department's failure to produce the requested documents.

**40.** *Karriem v. Barry,* No. 82–1583, slip op. (D.D.C. Jan. 17, 1983), *reprinted in* Appendix at 330–48.

**41.** *Id.* at 14–15, *reprinted in* Appendix at 343–44.

**42.** *Id.* at 15–18, *reprinted in* Appendix at 344–47.

**43.** *Id.* at 5, *reprinted in* Appendix at 334.

gion."[44] The court found that the Agreement is not directed solely at ministers and is not a "ruse to keep ministers out of the prison."[45] Nor was the Agreement employed selectively, to inhibit particular religions and their representatives.[46] Rather, the Agreement "is nothing more than an administrative tool to monitor activity within the prison; to ensure a peaceful, orderly environment within the institution, and to ensure that there is no misunderstanding about a visiting minister's right to compensation for his services."[47] Moreover, the court held that the Agreement's restrictions on political activity did not infringe the first amendment right to freedom of speech. Finding that the restriction was limited to partisan political activity, such as campaigning, the court concluded that the stricture was reasonably related to the maintenance of a peaceful and orderly prison environment.[48]

The court rejected Minister Karriem's contention that the Agreement violated his first amendment right to exercise his religious convictions freely. While acknowledging that Minister Karriem's "desire to enter the prison is religiously motivated,"[49] the court held that "[p]laintiff's status as a minister does not convert an otherwise permissible regulation into an impermissible

interference with the free exercise of religion."[50] Noting the discretion ordinarily accorded to the decisions of prison administrators concerning access to the institutions, the court concluded that the Agreement was essentially a time, place, and manner restriction, reasonably related to the "safe, orderly and efficient operation of a correctional institution and ... not inconsistent with Plaintiff's first amendment rights."[51] On February 4, 1983, Minister Karriem filed a Notice of Appeal. Minister Karriem's motion to proceed on appeal *in forma pauperis* was granted by this court,[52] and counsel was appointed to represent him on appeal.[53]

### III. DISCUSSION

■ ■ Minister Karriem raises a multitude of statutory and constitutional claims on this appeal.[54] But the central issue before us is whether Minister Karriem is *required* to be a volunteer under the Volunteer Services Act, and thus must submit to its statutory obligations. Despite the potential gravity of the appellant's constitutional claims, it is the general policy of the federal courts to avoid addressing broad constitutional issues unless their resolution is imperative in the context of the case at

44. *Id.* at 6, *reprinted in* Appendix at 335.

45. *Id.* at 7, *reprinted in* Appendix at 335.

46. *Id.* at 6, *reprinted in* Appendix at 336.

47. *Id.* at 6, *reprinted in* Appendix at 335.

48. *Id.* at 12–14, *reprinted in* Appendix at 341–43.

49. *Id.* at 8, *reprinted in* Appendix at 337.

50. *Id.*

51. *Id.* at 11, *reprinted in* Appendix at 340; *see id.* at 7–12, *reprinted in* Appendix at 336–41.

52. A similar motion in the district court had been denied on the ground that the appeal was frivolous. Appendix at 354.

53. We commend both the appointed counsel of record and her co-counsel for the valuable service they have rendered their client and this court.

54. Minister Karriem raises all of the issues on appeal that were presented in the district court: 1) the Volunteer Services Act and regulations do not apply to ministerial visitation in the District's prisons; 2) if construed to apply to such visits, the Act and regulations are unconstitutionally vague; 3) as applied to Minister Karriem, the Act and regulations violate his first amendment right to free exercise of his religion; 4) as applied to Minister Karriem, the Act and regulations violate the establishment clause of the first amendment both because they have a non-neutral effect on religion and because they inextricably intertwine government and religion; and 5) the Act and regulations violate Mr. Karriem's fifth amendment right to equal protection of the laws because not all ministers have been required to sign Volunteer Services Agreements and because an arbitrary classification has been created between those ministers who are required to sign Agreements and other frequent visitors who are permitted to enter Lorton to provide comparable services without signing the Agreement.

hand.[55] There is ambiguity in the factual record over whether the District of Columbia is requiring Minister Karriem, and other ministers similarly situated, to sign a Volunteer Services Agreement. As we previously observed, it appears from the record that the Department of Corrections mistakenly imposed this requirement only because of a misperceived request for assignment to volunteer status by Minister Karriem.[56]

■█ Furthermore, we have been directed to no pronouncement by the Department of Personnel, which is charged with the construction and enforcement of the relevant statute,[57] indicating that all clergy members seeking to minister on a regular basis are required to execute an Agreement as volunteers. As this court was informed by appellant at oral argument, ministers were routinely permitted to visit inmates and to perform religious services at Lorton, and, we may presume, at other District institutions throughout the period prior to adoption of the Act. Ministers operating in a capacity similar to that of Minister Karriem

were not considered to be volunteers before the Act was adopted, and there is nothing in the terms of the Act or regulations that would suggest any intention to alter the status of such individuals or to force them to become volunteers of the government as a requisite to continuing their ministries.

Here, appellant presents strong arguments that the Volunteer Services Act was never intended to apply to situations such as his. He points out that the Act defines a "volunteer" as "a person who donates his or her services to a specific program or department of the District of Columbia Government, by his or her free choice and without payment for the services rendered." [58] This language suggests that a volunteer must meet three conditions. First, there must be an affirmative and voluntary choice to volunteer; one may not be compelled to become a volunteer. Second, the service must be offered *to the District of Columbia government.* Third, the service must assist some government agency or program in carrying out its mis-

---

**55.** *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Powell v. Washington Metropolitan Area Transit Comm'n,* 466 F.2d 466 (D.C.Cir.1972); *see also Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977); *Bowen v. United States,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975); *Shamloo v. Mississippi State Bd. of Trustees of Insts. of Higher Learning,* 620 F.2d 516 (5th Cir.1980); *Beeson v. Hudson,* 630 F.2d 622 (8th Cir.1980); *Langston v. Johnson,* 478 F.2d 915 (D.C.Cir.1973); *Dorado v. Kerr,* 454 F.2d 892 (9th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 244, 34 L.Ed.2d 188 (1972); *Sohm v. Fowler,* 365 F.2d 915 (D.C.Cir.1966); *Lurk v. United States,* 296 F.2d 360 (D.C.Cir.1961), *aff'd sub nom. Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

**56.** *See supra* p. 35. Of course, the appellees cannot cure a statute or regulation that may impermissibly abridge constitutional rights by selectively not enforcing them against potential litigants. But here it appears instead that the appellees mistakenly enforced a regulation that was not meant to be applied on a compulsory basis.

**57.** The deference by courts to local administrative constructions of local statutes is customarily accorded to the interpretations advanced by the agency charged with the construction and enforcement of the statute. *See Columbia Broadcasting Serv., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 121, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). In this case, the relevant agency is the Department of Personnel, not the Department of Corrections. *See* D.C. CODE ANN. §§ 1–305, 1–306(a); *see generally supra* note 13 and accompanying text. Although the Department of Corrections promulgated some guidelines to supplement the personnel regulations, none of the issues in this case involves a construction of the Corrections Department guidelines. *See supra* notes 15–18 and accompanying text. With respect to the questions presented by this case, the Department of Corrections has served the purely ministerial function of requiring those individuals, determined by the standards enunciated by the Department of Personnel, to execute a form also promulgated by the Department of Personnel.

**58.** D.C. CODE ANN. § 1–308(2) (1981). The fact that the status of volunteer confers certain benefits generally applicable to paid employees also suggests that the status was not intended to be forced on persons who did not request it. *See supra* p. 31.

sion. Minister Karriem's involvement with the prison may well assist the chaplains' program in carrying out its mission; nevertheless, it seems clear from the record that it fails to fulfill the first two conditions. He has not *volunteered;* rather, volunteer status is being thrust upon him as a precondition to his continued access to the facility. Moreover, he does not wish to participate in any government program; he merely desires to extend his pastoral services to incarcerated members of his faith.

Therefore, it appears that the imposition of a "volunteer" status upon the appellant was the result of a misreading by the District of Columbia of the letter from Minister Karriem. The District of Columbia has also suggested quite strongly that an Agreement is not necessary in all cases. In fact, Minister Karriem is currently visiting the prison as a guest lecturer on a regular basis without having signed an Agreement.[59] On remand, the district court should determine whether, and in what manner, Minister Karriem is presently being restricted by not signing the Agreement. The district court should determine whether ministers can generally forego becoming volunteers if they adhere to reasonable time, place, and manner restrictions imposed by the Department.

So far we have observed that it does not appear that the Act and accompanying regulations necessarily require Minister Karriem to sign the Agreement before he can be permitted to resume his ministerial activities at Lorton. But if the Department of Corrections nevertheless intends on its own initiative to require all ministers regularly entering Lorton to execute a Volunteer Agreement, then the constitutional questions posed by Minister Karriem must be addressed. We are not ready today,

however, to resolve those questions since the record is incomplete and since the extent of the burden actually imposed on Minister Karriem is unclear.

This court has been presented with evidence that the Department of Corrections has already undertaken some steps towards clarification of its policy that appears to ameliorate the conflict between the parties in this case. Further clarification of the Department's policy may resolve most, if not all, of the factual ambiguities confronting this court, and may even lead to a mutually agreeable resolution of the instant controversy. The district court on remand should establish whether the standard form agreement's particular language is currently required.[60] If it is not, the District of Columbia may consider substituting language that would avoid the appellant's religious concerns and still accommodate the appellee's interests in prison security.[61] Minister Karriem has maintained that he is willing to submit to reasonable time, place, or manner regulations controlling access to and activities within Lorton in the interests of institutional security and order.[62]

Furthermore, the four specific requirements of the Volunteer Services Agreement, which appeared problematic from the standpoint of Minister Karriem's religious views, need further factual clarification. Here we neither decide nor urge upon the parties or the district court a "correct" resolution of these specific issues. Instead we remand to determine what genuine justiciable issues remain in contention. Such clarification will be essential to any later analysis of the constitutional questions that are potentially at stake.[63]

First, the requirement that the signator stipulate that he was donating his time or

---

**59.** *See* Appellees' Brief at 12 n. 21; *see also supra* note 37; Appendix at 212–13, 278, 290.

**60.** *See supra* p. 33.

**61.** Perhaps, substitution of the standard Agreement with the text in the personnel regulations, which were republished in 1982, *see supra* note 19, may be satisfactory to the appellant and appellees.

**62.** Appellant's Brief at 10.

**63.** In first amendment jurisprudence, for example, the development of a complete factual record is critical to the task of striking a balance between competing interests. *See e.g., Dreibelbis v. Marks,* 675 F.2d 579, 581 (3d Cir.1982); *Shabazz v. Barnauskas,* 598 F.2d 345, 347–48 (5th Cir.1979); *Burgin v. Henderson,* 536 F.2d 501, 504 (2d Cir.1976). The statutes and regulations must serve well-articulated security-related interests and be narrowly drawn to accomplish these interests. *See Procunier v. Martinez,* 416

services *to the District of Columbia government* may be modified or not necessary under the Department's policy. The district court should determine whether such a requirement may be meant simply to identify the volunteer status of the appellant's work. If so, the Agreement may be modified to state that Minister Karriem was volunteering his services *to the inmates* of Lorton.

Second, Minister Karriem's objection to the scope of supervision may no longer be at issue because the appellees have indicated that any such supervision was intended to involve restrictions on time, place, and manner, rather than substance.[64] As we previously noted, correction authorities have already substituted the prison administrator for Chaplain Ba'th as supervising official in response to a request from the district court.

Third, the Agreement's prohibition against political activity was conceded by the appellees to preclude only partisan political activities during working hours.[65] The Agreement may need simply to be clarified to reflect this position. Minister Karriem indicates that he has no desire to engage in such partisan political activity as long as he can continue to preach about "matters of politics, economics, and sociology as well as spiritual matters." [66]

Finally, Minister Karriem's objection that the Agreement is terminable at will may be met if the appellees modify the Agreement to indicate that the Department could not terminate his visits for a constitutionally impermissible reason, such as to restrict the substance of the appellant's ministry. Both parties may concede that the Agreement was not meant as a waiver of constitutional rights.

### CONCLUSION

The Department of Corrections has thus far proceeded on the theory that it is ob-

liged by the terms of the Act and regulations to require Minister Karriem to sign the Agreement before he can be permitted to resume his ministerial activities at Lorton. As we have seen, this construction is not compelled by the Act itself. We therefore remand to the district court for a determination as to whether the Corrections Department's interpretation of the Act is required by the Department of Personnel. If such a construction is not required, the district court should determine whether the Department of Corrections nevertheless intends on its own initiative to require all ministers regularly entering Lorton to execute a Volunteer Services Agreement as a security or administrative procedure.

If the Department of Personnel adopts the Corrections Department's construction of the Act, or if the Department of Corrections intends to enforce the signature requirement as a purely internal regulation, the district court will need to determine if these regulations permit a revised form of a Volunteer Services Agreement. Alternatively, the District might waive the requirement for those who, like Minister Karriem, are unable for religious reasons to comply, or might substitute other security devices, such as scheduling, searches, and identification procedures in order to facilitate the objectives of prison administrators without engendering unnecessary conflicts. We withhold final judgment on any constitutional objections until the Department has, on remand, been given an opportunity to clarify its policy.

*Vacated and remanded.*

---

U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). In the instant case, however, we do not yet decide any of the constitutional issues raised in the district court, pending completion of a full factual inquiry.

**64.** *See supra* p. 36; *see also* Appendix at 214; Appellees' Brief at 12, n. 21.

**65.** *See supra* pp. 36–37; *see also* Appellees' Brief at 25.

**66.** Appellant's Brief at 28.