72 F.3d 920
 315 U.S.App.D.C. 281
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America, Appellee,
v.
Jeffrey M. LEVINE, Appellant.
 No. 95-3038.
 United States Court of Appeals, District of Columbia Circuit.
 Dec. 4, 1995.
 
 Before: WALD, SENTELLE and HENDERSON, Circuit Judges.
 JUDGMENT
 This cause reached appeal from a judgment of the United States District Court for the District of Columbia, and it was briefed by counsel. The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir.Rule 36(c). For the reasons stated in the accompanying Memorandum, it is
 ORDERED and ADJUDGED, by the Court, that in No. 95-3038, with the agreement of both parties, that the District Court judgment is reversed and remanded.
 
 
 1
 The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 41(a).
 
 ATTACHMENT
 MEMORANDUM
 
 2
 Jeffrey Levine was convicted in 1994 on one count of perjury, in violation of 18 U.S.C. Sec. 1621, and one count of making a false statement to a department of the United States, in violation of 18 U.S.C. Sec. 1001. The charges against Levine arose out of his testimony in front of a congressional subcommittee investigating industry abuses of the Food and Drug Administration's ("FDA") generic drug approval process. On appeal, Levine argues that two intervening Supreme Court decisions, Hubbard v. United States, 115 S.Ct. 1754 (1995) and United States v. Gaudin, 115 S.Ct. 2310 (1995), mandate the reversal of both of his convictions. Levine also raises challenges to his sentencing and to the district court's decision to quash a subpoena he had caused to issue.
 
 
 3
 The government concedes that we must reverse and remand both convictions in light of intervening Supreme Court authority. However, despite the agreement by both parties that the false statement count must be dismissed entirely and the perjury count must be retried, the government urges us to hold that the district court correctly quashed the defendant's subpoena, since the subpoena issue is likely to recur on remand. Levine urges us to refrain from deciding any issue not necessary to the remand, but argues that if we decide the subpoena question, we should also address his sentencing claim.
 
 
 4
 Because the conceded need for a new trial on the perjury count renders the remaining questions unripe, we decline the parties' invitations to rule on collateral matters.
 
 I. BACKGROUND FACTS
 A. Background
 
 5
 The story leading up to Levine's conviction began in 1984, when Congress passed a law simplifying the process by which the FDA approves generic drugs. See Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585 (1984). Under the 1984 Act, the manufacturer of a generic drug could earn FDA approval simply by demonstrating that the drug was the bioequivalent of a brand-name product, without also making the more onerous demonstration that the drug is safe and effective. Apparently this legislation had the unanticipated effect of creating great incentive among manufacturers to be the first to reach the market with a generic drug. The competition that ensued led to a variety of abuses, including illegal payments made by manufacturers to FDA officials.
 
 
 6
 In 1988, the House Subcommittee on Oversight and Investigations, chaired by Congressman John Dingell, began investigating these corrupt practices. During the course of the investigation, executives from two pharmaceutical companies--Par and Quad--pled guilty to paying illegal gratuities to FDA officials. On July 17, 1989, members of the subcommittee's staff met with other representatives of the companies, including Levine, a Par executive, who assured the staff members that the men who had pled guilty were the only people involved in the wrongdoings. Three days later, however, Par's counsel disclosed to the subcommittee that Levine, at the time of the meeting, had known that at least one other person had been involved in the bribes. On August 4, 1989, the subcommittee issued subpoenas to Levine and other Par and Quad employees, ordering them to testify before the subcommittee.
 
 
 7
 Levine appeared before the subcommittee on September 11, and claimed that he had first learned of the illegal FDA payments in August of 1988. Before he testified, he submitted a written statement in which he claimed that no one other than the people who had already admitted responsibility was "knowingly involved" in the scandal. The charges against Levine, which resulted in his two convictions, grew out of his September 11 oral and written statements to the subcommittee.
 
 B. The Intervening Supreme Court Decisions
 
 8
 The parties now agree that Levine's conviction for making a false statement under Sec. 1001 must be dismissed entirely, and that his perjury conviction under Sec. 1621 must be retried. Section 1001 of Title 18 criminalizes the making of a false statement to "any department or agency of the United States." 18 U.S.C. Sec. 1001. After Levine's trial, but before his appeal, the Supreme Court held that the words "department or agency," as used in the statute, referred only to parts of the executive branch, and not the legislative branch, as the Court had previously held. Hubbard, 115 S.Ct. at 1758 (overruling United States v. Bramblett, 348 U.S. 503 (1955)). Because the congressional subcommittee before which Levine testified was not a "department" of the United States as used in Sec. 1001, his false statement could not support a conviction under that statute.
 
 
 9
 Levine's conviction for perjury under Sec. 1621 must also be remanded in light of an intervening decision. The perjury statute proscribes the making of a false statement, under an oath taken "before a competent tribunal," as to "any material matter." The district court, in keeping with the settled caselaw at the time, determined that the competency of the tribunal and the materiality of the false statement were questions of law to be decided by the court. See, e.g., United States v. Paxson, 861 F.2d 730, 731-32 (D.C.Cir.1988), cert. denied, 490 U.S. 1006 (1989); United States v. Bridges, 717 F.2d 1444, 1448 (D.C.Cir.1983), cert. denied, 465 U.S. 1036 (1984). After Levine's trial, however, the Supreme Court decided a case that the government agrees requires reversal; in United States v. Gaudin, 115 S.Ct. 2310 (1995), the Court held that, assuming materiality is an essential element of 18 U.S.C. Sec. 1001, the Constitution requires that the jury decide that element. Id. at 2314. Although Gaudin did not address the essential elements of the perjury statute, the parties agree that both materiality and competency are essential elements that must be decided by the jury. See United States v. Debrow, 346 U.S. 374, 376 (1953) (both elements are essential to a perjury charge); United States v. Reinecke, 524 F.2d 435, 437 (D.C.Cir.1975) (competency is an essential element).
 
 C. The Subpoena
 
 10
 In an effort to prove that the tribunal to which he lied was not "competent," Levine attempted to obtain, through a subpoena duces tecum, House records tending to support his theory that the subcommittee had elicited his testimony solely to establish a basis for perjury charges and not for the purpose of pursuing legislation. If his theory is correct, he claims, the subcommittee acted beyond the scope of its proper legislative function and therefore could not be a competent tribunal as required by Sec. 1621. In response to the subpoena, the subcommittee produced some of the requested documents, replied that no documents had been found to satisfy some requests, and invoked privilege to justify nondisclosure of other documents. On October 6, the court granted the House's motion to quash the subpoena based on privilege under the Speech or Debate Clause. See United States v. Levine, No. 94-cr-34 (D.D.C. Order filed Oct. 6, 1994).
 
 D. The Sentence
 
 11
 Levine claims that the district court erroneously allowed a three-level sentence enhancement based on a determination that Levine had "substantially interfered with the administration of justice." See U.S. Sentencing Guidelines Sec. 2J1.3(b)(2). Levine argues that the government failed to meet its burden of providing facts to support the increase, and that the court wrongly relied on the unsworn hearsay narrative of the prosecutor.
 
 II. DISCUSSION
 
 12
 Because the parties agree on the need to remand this case, we must only decide whether or not to reach the remaining questions raised by the defendant. We think it quite clear under the circumstances of this case that we should not address Levine's discovery and sentencing claims.
 
 
 13
 Levine raises a constitutional challenge to the district court's decision to quash his subpoena. In support of the motion to quash, the House invoked the Speech or Debate clause, and in opposition, Levine invoked his Sixth Amendment right to compulsory process and to confront witnesses against him.
 
 
 14
 The Supreme Court has consistently reiterated the principle we follow today--that courts should resist deciding constitutional questions they are not required to decide. E.g., Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988); New York City Transit Auth. v. Beazer, 440 U.S. 568, 582 (1979) ("If there is one doctrine more deeply rooted than any other in the process of Constitutional adjudication, it is that we ought not pass on questions of constitutionality unless such adjudication is unavoidable.") (citation omitted). This court has also recognized the need for judicial restraint in this area. See, e.g., United States v. Rostenkowski, 59 F.3d 1291, 1301-03 (D.C.Cir.1995) (remanding a Sec. 1001 conviction in light of Hubbard and declining to review the defendant's Speech or Debate clause claim); Lamprecht v. FCC, 958 F.2d 382, 389 (D.C.Cir.1992) (turning to appellant's constitutional question only after determining that the FCC had not exceeded its statutory authority); Harmon v. Thornburgh, 878 F.2d 484, 493-94 (D.C.1989) ("Our reluctance [to decide this issue] stems in part from our obligation to avoid unnecessary or premature constitutional rulings."); Karriem v. Barry, 743 F.2d 30, 38-39 (D.C.Cir.1984) ("[I]t is the general policy of the federal courts to avoid addressing broad constitutional issues unless their resolution is imperative in the context of the case at hand.").
 
 
 15
 The government acknowledges that we are not required to decide the subpoena and sentencing issues, but urges us nevertheless to decide the subpoena question for the benefit of the lower court, since the trial judge on remand might otherwise feel obligated to follow district court precedent suggesting that the defendant may have a right to the discovery he seeks. The government argues that the district court, in three prior cases, allowed "too intrusive an inquiry into the purpose of a congressional investigation." In other words, the government urges us not only to make an unnecessary constitutional determination, but in doing so to reverse prior rulings of the district court not on appeal.
 
 
 16
 In support of this argument, the government cites three cases in which this court allegedly has addressed issues that were not necessary to our holding. In each case, we determined that the collateral question was sufficiently likely to recur on remand so as to justify our decision to address the issue. In one of the cases cited by the government, however, we provided only minimal guidance--not a decision--on the collateral issue. United States v. David, 511 F.2d 355, 363 (D.C.Cir.1975).
 
 
 17
 In the remaining two cases, we did indeed offer opinions on matters we were not obliged to decide. In United States v. Sampol, 636 F.2d 621, 677 (D.C.Cir.1980), we found it "prudent" to discuss issues--including a sentencing issue--"that may recur on retrial." In United States v. Leonard, 494 F.2d 955, 958-70 (D.C.Cir.1974), we reversed the defendant's convictions on three grounds and then expressly addressed the remaining claims on which we did not find reason to reverse.
 
 
 18
 Levine attempts to minimize the precedential value of these cases by claiming that "none of those cases actually involved a determination of constitutional issues." Reply Brief at 4. This characterization is not accurate, however; Sampol addressed the defendant's Eighth and Fourteenth Amendment claims, 636 F.2d at 677-79, and Leonard addressed a Sixth amendment claim. 494 F.2d at 968.
 
 
 19
 Despite these two cases suggesting that perhaps we could reach the subpoena and sentencing issues if we chose, we believe that doing so in this case would be terribly unwise. It is not at all clear that the issues will arise in the same form, if at all, on remand. Although the defendant, if his case goes to trial for a second time, will almost certainly seek once again to subpoena House records, the possibility remains that the district court on remand will take different action. When the district court first addressed this issue, the judge was assuming that the competency of the tribunal was an issue for the court, rather than the jury to decide. On remand, the district court will determine whether the defendant's right to have a jury rule on competency affects the subpoena question. In any event, it is likely that we will have a more fully developed record on which to base our constitutional conclusions if and when this case reaches us again on appeal.
 
 
 20
 The recurrence of the sentencing question is equally speculative. On remand, the defendant might enter into a plea agreement with a compromise sentence; he might be acquitted; or the government might elect not to seek the same enhancement Levine now challenges.
 
 
 21
 Also weighing heavily in favor of judicial restraint in this case is the fact that the Speech or Debate Clause issue, on the merits, poses a complicated question with no bright line answer. Wright and Graham suggest that "[u]ntil the Supreme Court resolves this question [the conflict between constitutional privileges and the defendant's Sixth amendment rights], lower courts are wise to proceed carefully when the claim is made that a privilege must be denied because of the rights to confrontation and compulsory process." 23 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE, EVIDENCE Sec. 5437, at 890 (1980). We heed that advice today and decline to reach any collateral constitutional questions.
 
 
 22
 Reversed and remanded.